`

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE MANGHAM ) | Case No. 1:17-cv-0040 |
| *on behalf of* R.M. ) | |
| ) | JUDGE BENITA Y. PEARSON |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | THOMAS M. PARKER |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Defendant. ) | |

I. Introduction

Plaintiff Christine Mangham seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income ("SSI") on behalf of her minor child, R.M. under Title XVI of the Social Security Act. This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because substantial evidence supports the ALJ's decision and because Mangham has failed to identify any error of law in the ALJ's evaluation of her claim, I recommend that the final decision of the Commissioner be **AFFIRMED**.

II. Procedural History

Mangham applied for SSI on behalf of her minor child, R.M., on November 21, 2013. (Tr. 121-128). The Social Security Administration denied Mangham's application initially and upon reconsideration. (Tr. 75, 85) After an October 20, 2015 hearing, Administrative Law

Judge ("ALJ") George D. Roscoe denied the claim on November 19, 2015. (Tr. 8-26). The appeals counsel declined review of that decision, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-5)

### III. Standard for Child Disability Claims

The standard for evaluating a child disability claim differs from that used for an adult's claim. 42 U.S.C. § 1382c(a)(3)(C); *see also Miller ex rel. Devine v. Comm'r of Soc. Sec.*, 37 F. App'x 146, 147 (6th Cir. 2002). A child is considered disabled if she has a "medically determinable physical or mental impairment that results in marked and severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C). To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At Step One, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At Step Two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At Step Three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the Listings, the Commissioner must assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). This is done by evaluating how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [oneself]; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked"

2

limitations[1] in two or more domains, or an "extreme" limitation[2] in one domain, the impairments

functionally equal the Listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

## IV. The ALJ's Decision

On November 19, 2015, the ALJ decided:

1. R.M. was born on December 3, 2005. Therefore, she was a school-age child on October 16, 2013, the date the application was filed, and is currently a school-age child. (Tr. 14)

2. R.M. has not engaged in substantial activity since October 16, 2013, the application date. (Tr. 14)

3. R.M. has the following severe impairments: attention deficit hyperactivity disorder, disruptive behavior disorder and depressive disorder. (Tr. 14)

4. R.M. does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. (Tr. 14)

5. R.M. does not have an impairment or combination of impairments that functionally equal the severity of one of the listed impairments. (Tr. 16)

    In determining functional equivalence, the ALJ individually evaluated R.M.'s abilities under all six domains of functioning and made the following findings:

    a. Acquiring and using information: less than marked limitation
    b. Attending and completing tasks: less than marked limitation
    c. Interacting and relating with others: marked limitation
    d. Moving about and manipulating objects: no limitation
    e. Caring for yourself (Self-care): no limitation
    f. Health and physical well-being: no limitation

(Tr. 16-23) Based on these findings, the ALJ determined that R.M. had not been under a

---

[1] A "marked" limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). A "marked" limitation is "more than moderate" but "less than extreme." Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id.

[2] An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An "extreme" limitation means "more than marked." Id. "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id.

disability since October 16, 2013, the date the application was filed. (Tr. 23)

## V.     Relevant Evidence

### A.     Relevant Medical Evidence

R.M.'s school referred her to Beech Brook for a mental health assessment on March 20, 2013. (Tr. 212-227) R.M. was being disruptive in the classroom and refusing to do work. (Tr. 213) R.M.'s mother expressed concerns about R.M.'s peer relationships and challenges with her sibling at home. (Tr. 213) R.M.'s strengths were listed as being helpful, affectionate and intelligent. (Tr. 213) Beech Brook's records state that R.M. was getting A's and B's at school. (Tr. 218) The examiner noted that R.M. had reduced social skills, had challenges interacting with peers, challenges with being told no, tended to externalizing her feelings, was struggling with anxiety and sadness, and she did not appropriately solve her problems. (Tr. 224) R.M. had been placed in a foster home from age two to four. (Tr. 224) The therapist diagnosed attention deficit hyperactivity disorder ("ADHD"), depressive disorder and assigned a Global Assessment of Functioning ("GAF") score of 55. (Tr. 225)

R.M. met with Thomas Eppright, M.D., at Beech Brook on July 26, 2013 for pharmacologic management. (Tr. 230) Dr. Eppright noted a significant history of impulsivity, distractibility, hyperactivity, off task behavior and trouble sitting at school. He noted that she could do the academic work but was having difficulty in day-to-day functioning because of her symptoms. On examination, R.M. was impulsive, distracted, hyperactive and off task. She had no suicidal or homicidal thoughts, no delusions, hallucinations or paranoia. Her thoughts were goal directed; her insight and judgment were limited; and her intelligence was average to below average. Dr. Eppright diagnosed ADHD, combined type, rule out mood disorder, and assigned a GAF score of 55. (Tr. 230-231) He prescribed a trial of Adderall and started R.M. on Clonidine

4

at bedtime. (Tr. 231)

In August 2013, Social worker, Kimberly Fuller, met with R.M. to review her individualized school plan. ("ISP") (Tr. 241-242) Ms. Fuller noted that R.M. had made minimal progress in her ability to identify her thoughts and feelings and their connections to her behaviors. She had progressed in her ability to decrease impulsivity and increase productivity and seemed to benefit from medication. (Tr. 242)

R.M. again met with Dr. Eppright in August 2013. Dr. Eppright noted that R.M. had had an excellent response to medication and had significantly less impulsivity, distractibility and hyperactivity. R.M.'s appetite and sleep were good. Mangham and R.M. both felt that medication was beneficial. (Tr. 248)

On November 22, 2013, social worker, Jaclyn Allen, noted that R.M. continued to have difficulty getting along with others, following directions and avoiding distractions. (Tr. 257)

On December 6, 2013, R.M. met with Dr. Eppright to restart her medication. Dr. Eppright noted that R.M. had been off her medications for a period of time causing her to act more impulsive, distracted and hyperactive. (Tr. 266) In January 2014, Dr. Eppright examined R.M. and noted that she continued to do "quite well" on medication. She was better able to concentrate and stay on task. (Tr. 265)

Bruce Goldsmith, Ph.D. reviewed R.M.'s record on January 15, 2014. (Tr. 60-61) Dr. Goldsmith rated R.M.'s ability to function in six domains as follows: less than marked in acquiring and using information and in attending and completing tasks, no limitation in interacting and relating to others, moving about and manipulating objects, caring for self and health and physical well-being. (Tr. 61)

Patricia Semmelman, Ph.D., reviewed R.M.'s record on March 20, 2014. Dr.

5

Semmelman's ratings in six domains were the same as Dr. Goldsmith's ratings with the exception of the domain of interacting and relating with others, in which Dr. Semmelman opined that R.M.'s limitation was less than marked. (Tr. 69-71)

Katrina Dougherty, LSW, R.M.'s school therapist, completed a questionnaire on July 1, 2015. (Tr. 267-270) Ms. Dougherty had been R.M.'s therapist since March 2014 and saw R.M. at least twice a week. R.M. was not in special education classes and was on a waiting list to be tested for special education classes. (Tr. 267) R.M. was not capable of reading at a third grade level; she was reading at a second grade level but had difficulty remembering and retaining what she had read. Ms. Dougherty reported that R.M. struggled to sit still to complete activities; she was very impulsive; she had difficulty completing one task before starting another. R.M. required constant redirection and encouragement to complete tasks. Ms. Dougherty had to sit with R.M. to help her compete assignments. (Tr. 268) Ms. Dougherty reported that R.M. did not develop appropriate peer relationships. R.M. struggled with change; she would become easily irritated, destructive, and disengaged for the rest of the day. (Tr. 269) R.M. was frequently sent home for leaving her seat. (Tr. 270)

A discharge summary from Beech Brook on March 3, 2015 states that R.M. fought with her siblings and peers at school. "Teacher often reported client fighting peers and not following directions." R.M. made slight improvement with expressing her feelings more appropriately and in using coping mechanisms. (Tr. 286) R.M.'s diagnosis at discharge was depressive disorder, not otherwise specified, disruptive behavior, not otherwise specified, ADHD and her GAF score remained 55. (Tr. 287) R.M. was discharged because she did not return for treatment. However, the therapist recommended that she continue to receive mental health services. (Tr. 289)

R.M. underwent another mental health assessment at Beech Brook a few weeks after

6

discharge, on May 28, 2015. (Tr. 294-31)  R.M.'s teacher reported that she was very hyperactive and impulsive in the classroom. (Tr. 294)  The therapist observed that R.M. was very active and spiteful.  R.M. was diagnosed with disruptive behavior, NOS, temper, aggression, stealing, bullying, inability to take responsibility for bad behaviors. (Tr. 311)  The therapist recommended that R.M. continue therapy. (Tr. 311)  R.M. met with Dr. Eppright on July 29, 2015.  He noted that R.M. was still struggling with ADHD symptoms and adjusted her medications. (Tr. 314)

On September 21, 2015, after the administrative hearing, Alison Flowers, Psy.D. performed a psychological evaluation of R.M. (Tr. 322-334)  Dr. Flowers noted that R.M.'s demeanor and responsiveness ranged from uncooperative to cooperative. (Tr. 324)  R.M's manner of relating and social skills were poor due to irritability. (Tr. 325)  R.M's mood and affect were irritability; her attention and concentration were intact; she was able to count and perform simple calculations.  Her recent and remote memory skills were impaired due to her behavior. (Tr. 325)  Dr. Flowers noted that R.M.'s attitude toward the evaluation was uncooperative and apathetic.  R.M. failed to listen to instructions which had to be repeated. (Tr. 326)  Dr. Flowers diagnosed ADHD, combined type, moderate and unspecified depressive disorder, noting that the diagnosis was reported by R.M.'s mother. (Tr. 328)  Dr. Flowers opined that R.M.'s behavior was likely impacting her ability to acquire and use information.  (Tr. 329)  Dr. Flowers completed a medical source statement related to an adult's ability to do work related activities.  In this form, Dr. Flowers opined that R.M. had marked limitations in her ability to understand and remember simple instructions, carry-out simple instructions, and carry-out complex instructions. She also opined that R.M. had marked difficulties interacting appropriately with the public and that her behavior would impact her education experience. (Tr. 331-332)

### B. Educational Records

R.M.'s first grade teacher, Nina Anderson, completed a teacher questionnaire on February 28, 2014. (Tr. 176-179) R.M. had difficulty with reading because of misbehavior in the classroom, but math did not present a challenge. When R.M. paid attention and behaved, her work was completed. (Tr. 177) Ms. Anderson reported that R.M.'s misbehavior included crawling on the floor, throwing books and papers, slamming desks, singing out loud in class, loud talking during instructions, disregarding directives from adults, and throwing crayons and paper on the floor. (Tr. 179)

Disciplinary records from R.M.'s school show that she served nine suspensions from April 2014 to September 2016 for fighting, pushing, hitting other students, not adhering to school culture/directives, and threatening to harm another person or intentionally causing them to fear for their personal safety. (Tr. 192)

### C. Hearing Testimony

Christine Mangham ("Mangham") testified that R.M. lived in her household with her three other children, and with Mangham's mother and father. (Tr. 36) Mangham felt that R.M. was very impulsive and hyper. R.M. took medications but Mangham believed that only one of the medications helped with R.M.'s behavior. R.M. was in regular classes at school and was getting B's, C's and D's. R.M. had been held back in kindergarten. (Tr. 37)

Mangham testified that R.M. had no friends, but she acknowledged that Ms. Anderson's questionnaire indicated that R.M. was extroverted and gravitated toward other students. (Tr. 39-40) Due to her behavior, R.M. did not have any friends in her neighborhood and was not invited to go to parties to which her siblings were invited. Mangham stayed home with R.M. when her other children went to parties. (Tr. 46)

8

R.M. did not get along with her siblings. (Tr. 42) Once, she threw a toy at her brother resulting in an injury requiring stitches. (Tr. 42) Mangham also testified that R.M. was violent toward her. (Tr. 45) R.M. was suspended several times for fighting, throwing chairs and being disruptive at school. (Tr. 46-47, 52) Mangham told R.M.'s doctor that she was violent and he increased her medication dosage. (Tr. 48) R.M. also met with a counselor every other day; they met both at school and at Mangham's home. (Tr. 47)

R.M.'s grandmother, Darlene White Mangham, ("Darlene") also testified at the hearing. (Tr. 49-54) Darlene testified that she cared for R.M. Darlene gave medication to R.M. every night. R.M. did not want to take it, but if she didn't she was "wild." (Tr. 50) Darlene stated that R.M. hit her siblings and did not have any other friends. No one showed up for a birthday party that Darlene hosted for R.M. (Tr. 51) Darlene was involved at the children's school and went to PTA meetings. If R.M. got in trouble at school, the teacher called Darlene. (Tr. 52) Darlene also took R.M. to her doctor's appointments. Darlene tried to take R.M. to shows or skating, but her behavior was so bad that Darlene felt that she could not take her anywhere. Darlene had no problems with her other grandchildren. (Tr. 53)

## VI. Law & Analysis

### A. Standard of Review

The court's review is limited to determining whether substantial evidence in the record supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence

9

has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.     Whether R.M.'s Impairments Functionally Equal a Listed Impairment**

A child's disability is "functionally equals" the disability Listings when she has a marked

limitation in at least two out of six domains of functioning, or an extreme limitation in just one. 20 C.F.R. § 416.926a(a); *Elam ex rel. Golay v. Comm'r*, 348 F.3d 124, 127 (6th Cir. 2003). A "marked" limitation is "more than moderate" and "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(a) & (e)(2). The ALJ found that R.M. had no extreme limitations and only one marked limitation (interacting and relating with others)[3]. (Tr. 20) Because only one marked limitation was found, R.M. did not functionally equal the disability Listings. Mangham argues that R.M. also had marked limitations in the domain of attending and completing tasks. ECF Doc. 12, Page ID# 411-415. The Commissioner counters that substantial evidence supported the ALJ's finding that R.M. had less than marked limitations in this domains. ECF Doc. 14, Page ID# 441-446. Because Mangham challenges the ALJ's findings on only one of the six domains, it is unnecessary to address the ALJ's findings on the other five domains.

### 1. Attending and Completing Tasks

In the domain of attending and completing tasks, the Commissioner considers how well the child is able to focus and maintain her attention and how well she begins, carries through, and finishes activities, including the pace at which she performs activities and the ease with which she changes them. 20 C.F.R. §416.926a(h). Relevant portions of the Commissioner's functional equivalence Regulation provide the following guidance in the domain of attending and completing tasks:

> (1) General. (i) Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you

---

[3] Mangham agrees with the ALJ's finding that R.M. had a marked limitation in the domain of interacting and relating to others. ECF Doc. 12, Page ID# 412.

11

lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

(ii) Adequate attention is needed to maintain physical and mental effort and concentration on an activity or task. Adequate attention permits you to think and reflect before starting or deciding to stop an activity. In other words, you are able to look ahead and predict the possible outcomes of your actions before you act. Focusing your attention allows you to attempt tasks at an appropriate pace. It also helps you determine the time needed to finish a task within an appropriate time-frame.

20 C.F.R. §416.926a(h)(1).

The Regulations then set forth the following pertinent age group descriptors for evaluating functional equivalence in the "attending and completing tasks" domain as well as some examples of limited functioning in that area:

(iv) School-age children (age 6 to attainment of age 12). When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

\* \* \*

(3) Examples of limited functioning in attending and completing tasks. The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or "extreme" limitation. Whether an example applies in your case may depend on your age and developmental stage; e.g., an example below may describe a limitation in an older child, but not a limitation in a younger one. As in any case, your limitations must result from your medically determinable impairment(s). However, we will consider all of the relevant information in your case record when we decide whether your medically determinable impairment(s) results in a "marked" or "extreme" limitation in this domain.

> (i) You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
>
> (ii) You are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
>
> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.
>
> (iv) You are easily frustrated and give up on tasks, including ones you are capable of completing.
>
> (v) You require extra supervision to keep you engaged in an activity.

20 C.F.R. §416.926a(h)(2)(iv), (v) and (h)(3).

The ALJ found that R.M. had a less than marked limitation in the domain of attending and completing tasks. (Tr. 20) He explained,

> This was the opinion of the state agency psychologist and the undersigned gives this opinion great weight. (Ex. 3A and SSR 96-6p).
>
> The claimant has always been in regular classes. If she behaves, she completes her assignments. She is currently receiving B and C grades. Her cognition is intact. (Ex. 1F and 9E)
>
> For these reasons, the undersigned disagrees with Dr. Flowers, who opined the claimant had marked limitations in completing even simple tasks.

(Tr. 20)

Mangham argues that the ALJ erred in this finding. Mangham contends that the ALJ should not have relied on the reviewing agency physician, Dr. Semmelman, because she did not review R.M.'s complete record. Mangham contends the ALJ should have relied on different evidence in the record, namely: 1) a questionnaire from R.M.'s first grade teacher, Ms. Anderson; 2) a report from R.M.'s therapist, Ms. Dougherty; 3) records from Beech Brook favorable to plaintiff; 4) records showing that R.M. repeated kindergarten and was on a list to be tested for special education classes; and 5) the opinion of consulting examiner, Dr. Flowers.

The evidence invoked by Mangham is not nearly as compelling as she contends. The questionnaire from Ms. Anderson, R.M.'s first grade teacher, is equivocal. The ALJ actually cited the questionnaire in support of his decision noting that if R.M. behaved, she was able to complete assignments. (Tr. 20, 177) The questionnaire stated several times that R.M.'s abilities are limited by her misbehavior. (Tr. 177, 179) The ALJ considered this evidence and was not required to assign any greater significance to it. Nor was he required to assign particular significance to the fact that R.M. repeated kindergarten or was on a list to be considered for special education. The evidence showed that R.M. was in a regular classroom and was receiving acceptable grades. (Tr. 176, 218) She did not fail first grade, which was completed by the time of the hearing. (Tr. 38)

The same is true of records from Beech Brook. While some of the records could have supported a finding of a marked limitation in attending and completing tasks, other portions of the records did not. For example, the records state that one of R.M.s strengths washer intelligence (Tr. 213) and that she was getting A's and B's at school. (Tr. 218) These notes suggest that she had less than a marked limitation in the domain of attending and completing tasks. The ALJ was justified in implying that such grades signaled an ability to stay on and complete tasks.

As to Therapist Dougherty's report, the ALJ expressly discussed this report and explained why he did not assign it more weight:

> The record also contains a treating source statement from Katrina Daugherty, LSW (Ex. 2F). While Ms. Daugherty is not an acceptable medical source, the undersigned has considered her opinions as required under SSR 06-3p. Ms. Daugherty reports the claimant is impulsive, hyperactive, and has difficulty focusing. However, Ms. Daugherty makes no reference to the claimant taking medication or being non-compliant with medication. It should also be noted that at Beech Brook, where Ms. Daugherty is the claimant's counselor, the claimant was given a GAF of 55, meaning moderate symptoms.

14

(Tr. 18) Ms. Daugherty was an "other source." In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Although the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources[,]' the ALJ must nevertheless have "considered" those opinions. *Hatley v. Comm'r of Soc. Sec.,* 2014 U.S. Dist. LEXIS 99471, at *24, 2014 WL 3670078 (N.D. Ohio 2014); see also *Brewer v. Astrue,* 2012 U.S. Dist. LEXIS 10643, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-03p, 2006 SSR LEXIS 5 does not include an express requirement for a certain level of analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'"). Here, the ALJ expressly considered Ms. Daugherty's opinions and even explained why he did not assign them more weight. He properly analyzed her report and was not required to give it more weight than he did.

Regarding Dr. Flowers' consultative exam, the ALJ discussed her opinions at several points in his decision. In considering whether R.M.'s impairments met one of the listings, the ALJ stated,

> On September 21, 2015, the claimant underwent a consultative psychological evaluation performed by Alison Flowers, Psy.D. (Ex. 5F). She described the claimant as clear, oriented, coherent, with no thought disorder, as having normal speech, as having normal motor activity, and as non-psychotic. (Ex. 5F page 4)
>
> Dr. Flowers reported,
>
> "The claimant's demeanor and responsiveness to questions ranged from uncooperative to cooperative. The claimant was very uncooperative during the interview, when she was asked personal questions. She was relatively more cooperative during the mental status examination. Her manner of relating and social skills were poor due to irritability. (Ex. 5F, page 4).
>
> Dr. Flowers reported,

15

> "Intellectual functioning is difficult to estimate, as the claimant's behavior impacted her performance on both the mental status examination and psychological testing. General fund of information was somewhat limited today, although this may have been related to her behavior. (Ex. 5F page 5).
>
> Dr. Flowers reported the claimant's psychometric testing was invalid because "she evidenced moderate irritability during the appointment, which likely negatively impacted her performance. She required repetition of instructions due to deliberate failure to attend. Her style of responding was trial and error and careless. She gave up quickly and often chose to just not respond. Her attention and concentration appeared to be good, and "The claimant's irritability negatively impacted her performance and she would often not even respond to the examiner, making the results of the psychological evaluation invalid. (Ex. 5F page 6).

(Tr. 15-16) The ALJ also noted that Ms. Flowers had completed an adult evaluation form, and thus did not provide the correct domain evaluations for a child's application. (Tr. 17)

Generally, the Commissioner must give more weight to the opinion of a source who has examined a claimant than to one who has not. 20 CFR § 416.927(c). However, in this instance, the ALJ had good reasons for not assigning greater weight to Dr. Flowers' opinions. Dr. Flowers repeatedly stated in that R.M. was irritable and that her irritability and unwillingness to cooperate affected the validity of the exam. In describing R.M's abilities and limitations in attending to and completing tasks, Dr. Flower partly relied on reports from R.M.'s mother:

> The claimant has been diagnosed with ADHD. There are reported problems related to sustaining attention both in school and at home. The claimant sustained attention during this appointment, although she had taken her medication on the day of the appointment. Her problems related to irritability, however, did impact her ability to complete tasks today.

(Tr. 329-330) Elsewhere in her notes, Dr. Flowers found that "R.M.'s attention and concentration appeared to be good." (Tr. 327) Dr. Flowers was not a treating source, and the ALJ was not required to provide good reasons for disagreeing with her conclusion that R.M. had marked limitations in completing even simple tasks. *See Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). Nevertheless, the ALJ did provide reasons, not the least of which was

16

that Dr. Flowers' evaluation rated R.M. on categories that were relevant to an *adult's* abilities to do work-related activities. (Tr. 331-333) The ALJ did not unreasonably disagree with Dr. Flowers' findings. He expressly considered the report, accepted some findings and explained why he did not assign greater weight to it on the particular domain evaluation in dispute.

Nor did the ALJ improperly consider the opinion expressed by the reviewing agency psychologist, Dr. Semmelman. Plaintiff contends that Dr. Semmelman's opinion should have been rejected because she did not review all of the evidence. However, in *McGrew v. Comm'r of Soc. Sec.,* 343 Fed. App'x 26, 32, (6th Cir. 2009), the Sixth Circuit held that an ALJ properly considered state-agency physicians' opinions even though they had not reviewed claimant's entire record. So long as the ALJ reviews the entire record himself, it is not improper for him to consider a physician's opinion rendered before the record is complete. *Id.*

Substantial evidence supported the ALJ's finding that R.M. had a less than marked limitation in the domain of attending and completing tasks. The fact that Mangham has pointed to evidence supporting a different conclusion does not negate the evidence on which the ALJ relied. Drs. Goldsmith and Semmelman opined that plaintiff's limitation was less than marked in the domain of attending and completing tasks. (Tr. 70-71) The record showed that plaintiff was capable of completing tasks when she behaved. (Tr. 48, 177) The record contained notes stating that R.M. was intelligent, that she received A and B grades; and Dr. Flowers had noted that she demonstrated good attention and concentration. (Tr. 213, 218, 327)

The regulations emphasize that "[n]o single piece of information taken in isolation can establish whether you have a 'marked' or an 'extreme' limitation in a domain." 20 C.F.R. § 416.926a(e)(4)(i). The substantial evidence standard presupposes that there is a "zone of choice" within which the Secretary may proceed without interference from the courts. If the Secretary's

17

decision is supported by substantial evidence, a reviewing court must affirm. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). The Commissioner's decision must be affirmed so long as "such relevant evidence [exists] as a reasonable mind might accept as adequate to support" it. *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994). Because substantial evidence supported the ALJ's finding that R.M. had less than marked limitations in the domain of attending and completing tasks – the single issue Mangham raised – remand is not warranted. There is no other suggestion that the ALJ failed to correctly apply the applicable legal standards.

## VII. Recommendations

The ALJ's decision is supported by substantial evidence in this case and Mangham has failed to identify any error of law requiring remand. I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: December 11, 2017

Thomas M. Parker
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).